IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DONNY L. DAVIS and JERED HALL, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MLB TRANSPORTATION, INC., *et al.*, | : | CIVIL ACTION NO. 1:13-CV-1224-LMM |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ORDER

Plaintiffs Donny L. Davis and Jered Hall filed suit on April 15, 2013 alleging that Defendants violated various provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* The case proceeded to a bench trial on January 14, 2019. The parties then provided their proposed findings of fact and conclusions of law. After due consideration of the evidence presented, the Court issues the following findings of fact and conclusions of law:

## Findings of Fact

### A. Parties

1. During the period covered by the instant case, April 15, 2010 through July 13, 2013, Defendant MLB Transportation, Inc. ("MLB") was

engaged in transporting disabled veterans under a contract with the Department of Veterans Affairs.

2.    Defendant Michael L. Baker owns 49% of MLB. Mr. Baker was seldom in the office and spent most of his time developing business for MLB.

3.    Virginia H. Baker, Michael Baker's wife, was employed by MLB as Operations Manager. Her responsibility was to insure contract compliance. If the VA had an issue with an MLB employee, the VA would contact Mrs. Baker, who would then inform Mr. William Burrell.

4.    William Burrell was MLB's General Manager from 2010 to 2013. Although he was not on MLB's payroll beginning in January 2013, Mr. Burrell testified that he worked as a consultant for MLB at different points during 2013 and was paid directly by Mr. Baker. As General Manager, Mr. Burrell ran the day-to-day operations of MLB. Mr. Burrell was also responsible for hiring and firing employees. After Mr. Burrell made the decision to fire an employee, Mr. Baker— as Mr. Burrell's direct supervisor—had to approve the decision. Mr. Baker generally approved Mr. Burrell's decisions. Mr. Burrell testified that he did not remember firing employees when he worked as a consultant for MLB but that he could have done so.

5.      Keylum Young was employed by MLB as Personnel Manager. Her duties included payroll and human resources management.

6.      Plaintiffs Donny L. Davis and Jered Hall worked as drivers for MLB.

7.      Both Plaintiffs began working for MLB prior to April 15, 2010.

8.      Plaintiffs' duties as drivers included the pick-up and drop-off of patients at the Atlanta VA Medical Center and other surrounding clinics. MLB's dispatch office provided Plaintiffs with daily schedules that reflected who they would pick up and their routes.

**B. <u>Compensatory Time System and Recording Hours Worked</u>**

1.      Employees were to be paid an hourly rate of $10.70 for all hours worked up to 40 hours in a workweek.

2.      Employees were to be paid overtime for hours worked between 40 and 50 hours each workweek at a rate of $16.05.

3.      Employees were to be paid for 80 hours straight time plus 20 hours overtime each two-week pay period.

4.      When an employee worked over 100 hours in a two-week period, MLB would take the hours over 100 and place them in a compensatory time ("comp time") bank at time and a half.

5.      MLB did not always add 1.5 hours into the comp time bank for each one hour of overtime worked.

6.  At one point during Plaintiffs' employment, MLB only added one hour of comp time to the comp bank for each one hour of overtime an employee worked.

7.  At an unspecified time, MLB changed this practice and began adding 1.5 hours into the comp time bank for each one hour of overtime an employee worked.

8.  MLB used the comp time bank in the following manner:

    a.  When an employee worked fewer than 100 hours in a pay period, comp time was deducted from the employee's comp bank to increase the employee's hours to 100 for that pay period. These comp time hours were identified as personal time on employees' paychecks.

    b.  When an employee requested time off, comp time was used to pay the employee for the time off, unless the employee was using vacation time.

        i.  This comp time was reflected as personal time and was paid at a rate of $10.70 an hour.

    c.  When an employee was required or asked to take time off, he or she generally used hours collected in the comp bank and was still paid for a full workweek.

    d.  When an employee's employment ended, MLB paid the employee the balance of his or her comp time in cash.

4

9.      MLB did not provide employees with a written copy of their comp time balance.

10.     If an employee wanted to know the balance in his/her comp bank, he or she could ask Ms. Young, who would orally inform them of their comp time balance.

11.     Mrs. Baker testified that the comp time balances were maintained on a hard copy in an office drawer. Ms. Young also kept an excel spreadsheet on her computer.

12.     Employees were required to keep track of their hours on daily log sheets.

13.     The daily log sheets provided a place for employees to enter their "in time," "out time," and "break time."

14.     At the end of an employee's shift, the employee turned his or her daily log sheet in to MLB office personnel.

15.      MLB used the daily logs to calculate employees' weekly work hours.

16.     Dispatchers would sometimes record breaks on the daily logs after employees had turned them into the office without notifying the employee or checking to see if the employee actually took the break.

## C. <u>Donny Davis' Compensatory Time and Termination</u>

1.      Mr. Davis regularly worked over 50 hours in a workweek during his employment with MLB, averaging between 52 and 57 hours per week.

5

2.      Mr. Davis tried to keep track of the hours he worked each week by making copies of his daily logs and visiting the office weekly to discuss any potential discrepancies in his paychecks.

3.      If there were discrepancies in his paychecks, Mr. Davis would notify MLB personnel.

4.      There were times when there were errors in the total number of hours reflected in Mr. Davis's comp time bank. For example, in February 2010, Mr. Davis wrote Mr. Burrell a letter informing MLB that his records reflected a total of 116.25 hours for a pay period, as opposed to the 106 hours documented by MLB. MLB agreed that Mr. Davis was owed an additional 10 hours and compensated him by adding 10 hours to his comp bank.

5.      Mr. Davis also noticed a discrepancy in his comp time hours on his paycheck dated August 3, 2012. According to Ms. Young, his comp time balance was 612.33 hours as of July 20, 2012 but, according to Mr. Davis, his comp time balance was 615 hours.

6.      At least twice during his employment MLB forced Mr. Davis to take significant time off using hours from his comp time bank. First, in July 2010, Mr. Davis was told he could not come to work so that MLB could diminish his comp time balance. His paystubs for both the July 3, 2010 pay period and the July 19, 2010 pay period reflect

that he was paid 100 hours of personal time, at a rate of $10.70 an hour for both pay periods.

7.   In late 2012, MLB again required Mr. Davis to take significant time off. Accordingly, Mr. Davis received comp time payments, in varying amounts, at a rate of $10.70 an hour for the pay periods between November 19, 2012 – January 14, 2013.

8.   As of December 2012, Mr. Davis's comp time balance was 591.47 hours, per MLB's records. According to Mr. Davis, he had approximately 600 hours of comp time around that time. Mr. Davis testified that the time he was required to take off in December 2012 was applied against that 600 hour balance.

9.   In or around January 2013, Mr. Davis and several other MLB employees met with an attorney to discuss their rights under the FLSA.

10.  Mr. Baker testified that he was aware that several of his employees had met with an attorney about pursuing overtime claims. Mr. Baker testified that he learned of this because the brother of Judy Murphy, a former plaintiff in this case, told him "everything."

11.  In a letter dated January 6, 2013, Mr. Davis requested not to work on weekends due to his new upholstery business.

12.  Mr. Davis was injured at work on January 22, 2013.

13.   Mr. Davis went on leave beginning February 1, 2013. Mr. Davis received workers' compensation benefits from February 1 until June 2, 2013.

14.   In a letter dated February 17, 2013, MLB terminated Mr. Davis' employment. Mr. Baker signed the letter.

15.   Four other employees who were former plaintiffs in this case were also terminated by MLB on February 17 via letters signed by Mr. Baker.

16.   On February 20, 2013, Mr. Davis went to MLB's office to return the company equipment.

17.   When he went in to return his equipment Ms. Bowen, the dispatcher, told Mr. Davis that the letter had been sent in error. Mr. Davis testified that he discounted this statement because it was not from "someone higher than her."

18.   At some point after February 20, 2017, Mr. Davis received a letter from MLB stating that his termination was in error. This letter was also signed by Mr. Baker and dated February 17, 2013.

19.   Subsequently, Mr. Davis received a letter from the company's health insurance company stating that his insurance had been canceled due to his termination.

20.   Mr. Davis was released to full duty on May 20, 2013. Mr. Davis did not provide the release to MLB.

21.    Mr. Davis, having never used workers' compensation before, testified that he assumed MLB would have received notice of his return to work status.

22.    In May 2013, Mr. Davis applied for unemployment benefits. He was initially denied unemployment and appealed. A hearing was held via telephone, during which both Mr. Burrell and Ms. Young testified that Mr. Davis had not been terminated by MLB. The Georgia Department of Labor ultimately granted Mr. Davis' request for unemployment benefits.

23.    Mr. Davis received a final check from MLB on February 15, 2013, which totaled $1,226.52. MLB indicated that the check included the amount of comp time he had accrued with the MLB, plus normal pay. At trial, Mr. Davis testified that he did not know whether that final check was for comp time pay or vacation pay but that he did not believe that check reflected all the comp time that he was still owed.

24.    MLB did not ask Mr. Davis to return to work after the unemployment hearing.

25.    Mr. Burrell initially testified that he drafted a letter terminating Mr. Davis on May 20, 2013, even though the original termination letter was dated February 17, 2013. Mr. Burrell then clarified that on July 16, 2013, he instructed Ms. Young to fill out a notice of termination form for Mr. Davis, citing no show/no call beginning on May 20,

2013 as the reason for Mr. Davis' termination. The notice of termination was sent to the payroll company. Mr. Burrell was working as a consultant for MLB at the time.

26. In January 2017, the U.S. Department of Labor ("DOL") informed Mr. Davis that it was investigating claims for wages and other compensation owed to him pertaining to his employment with MLB. The DOL's investigation only covered the workweeks from July 14, 2012 through December 8, 2012 and was based on the Contract Work Hours-Safety Standards Act, Service Contract Act, not the FLSA. Mr. Davis has not been paid any funds by the DOL with respect to his employment with MLB.

27. Mr. Davis claims that he is entitled to $11,315.25 in overtime damages. As set forth in Plaintiffs' Exhibit 27, Mr. Davis arrived at this number by calculating the number of hours he worked over 50 in each week multiplied by his proper overtime rate of $16.05.

28. Mr. Davis claims that he is entitled to $4,251.00 in retaliation damages. As set forth in Plaintiffs' Exhibit 28, Mr. Davis arrived at this number by adding up his average weekly hours worked, multiplying his regular rate of $10.70 by all hours up to 40 in a workweek, and multiplying his hours over 40 in a workweek by his overtime rate of $16.05, and then subtracting all other earnings he made in each respective workweek.

10

29.     Defendants claim that Mr. Davis is owed, at most, $456.32 for
        unpaid compensatory time. As set forth in Defendants' Exhibit 38,
        Defendants arrived at this number by calculating the amount that
        should have been paid for hours worked and comparing it to
        amounts actually paid to Mr. Davis using payroll records provided by
        MLB. Defendants then reconciled those amounts with paystubs
        supplied by Mr. Davis showing the vacation and holiday pay that he
        received.

## D. **Jered Hall's Compensatory Time and Break Time**

1.      During the first portion of his employment, Mr. Hall regularly
        worked over 100 hours in a pay period and earned comp time.

2.      There were times when Mr. Hall believed he should have had more
        comp time hours available to him than he was told were in his comp
        time bank.

3.      In 2012, Mr. Hall seldom worked 100 hours in a pay period. His
        compensatory time was applied to raise his pay up to 100 hours in
        each pay period.

4.      At a certain point in 2012, MLB stopped rounding up Mr. Hall's pay
        to 100 hours per pay period.

5.      Mr. Hall testified that MLB stopped giving him work in late 2012.

6.      As of December 2012, MLB's records reflect that Mr. Hall still had a
        comp time balance of at least 14.24 hours.

11

7.      Mr. Hall quit on January 18, 2013.

8.      Mr. Hall did not know what his comp time balance was when he quit.

9.      Mr. Hall testified that he believed his final check from MLB reflected vacation time, not comp time.

10.     Between assignments, Mr. Hall and other drivers had to sit and wait to be called for their next assignment. Mr. Hall was required to sit and wait either at the VA or at a gas station down the street from the VA between assignments. He could not leave his waiting spot and was expected to be available for a call while waiting on an assignment.

11.     In 2015, Mr. Hall's attorney asked him to prepare a handwritten list of hours that he worked each day, noting when he took a break or lunch. Mr. Hall used his daily log sheets to make his list.

12.     In reviewing his daily log sheets, Mr. Hall noticed that someone else had filled in break times on days that he had not written in a break. For example, Mr. Hall testified that someone wrote in a break time on his log sheet for September 20, 2012 after he turned in his daily log reflecting no breaks on that day.

13.     MLB dispatchers would sometimes write breaks in on drivers' daily log sheets.

14.     When making his handwritten notes, Mr. Hall did not have all of his daily log sheets. His daily log sheets were maintained by Defendants.

12

15.     In January 2017, the U.S. DOL informed Mr. Hall that it was

        investigating claims for wages and other compensation owed to him

        pertaining to his employment with MLB. The investigation only

        covered workweeks from July 28, 2012 through January 5, 2013 and

        was based on the Contract Work Hours-Safety Standards Act,

        Service Contract Act, not the FLSA. Mr. Hall has not been paid any

        funds by the DOL with respect to his employment with MLB.

16.     Mr. Hall claims he is owed $8,056.62 in overtime damages. As set

        forth in Plaintiffs' Exhibit 29, he arrived at this number by

        calculating his hours worked over fifty in each workweek multiplied

        by his proper overtime rate of $16.05.

17.     Defendants claim that Mr. Hall was overpaid for his compensatory

        time. As set forth in Defendants' Exhibit 39, Defendants arrived at

        this number by calculating the amount that should have been paid

        for hours worked and comparing it to amounts actually paid using

        payroll records provided by MLB. Defendants then reconciled those

        amounts with paystubs supplied by Mr. Hall showing the vacation

        and holiday pay that Mr. Hall received.

### E.  **MLB's Reliance on Counsel**

1.      Prior to working at MLB, Mrs. Baker worked as a police officer for

        the City of Atlanta Police Department. One of her jobs there was

13

Personnel Manager. The police department used a compensatory time system for overtime hours worked by police officers.

2.     At some point, Mrs. Baker attended a course on employment law from the University of Phoenix taught by attorney James Rambeau, Jr.

3.     Mrs. Baker asked Mr. Rambeau if she could give him her husband's number because her husband had questions about employment law.

4.     Mrs. Baker testified that her husband ran the issue of a compensatory time bank being used by MLB by Mr. Rambeau, who supplied a form regarding a comp time policy that he recommended having MLB employees sign.

5.     Mrs. Baker began working for MLB in or around November 2009.

6.     At some point during Mrs. Baker's tenure at MLB, MLB began implementing the comp time policy because it was having difficulty ensuring that it would have enough cash on hand for the hours that its drivers were accumulating each month.

7.     Mrs. Baker testified that she learned that private employers could not use compensatory time during an investigation of MLB conducted by the Wage and Hour Division of the U.S. DOL in the spring of 2013.

8.     Based on this information, MLB ceased using compensatory time.

14

9.    Mrs. Baker testified that all employees were paid their compensatory time down to zero in the spring of 2013.

## CONCLUSIONS OF LAW

A. **Overtime Claims**

1.  Congress enacted the FLSA in 1938 to provide minimum wage and hour protections for workers. See Allen v. Board of Public Ed. For Bibb County, 495 F.3d 1306, 1311 (11th Cir. 2007).

    > Under the FLSA, an employer may not employ his employee for a workweek longer than forty hours unless his employee receives overtime compensation at a rate not less than one and a half times his regular rate. 29 U.S.C. § 207(a)(1)). A person is employed if he or she is suffered or permitted to work. 29 U.S.C. § 203(g). It is not relevant that the employer did not ask the employee to do the work. The reason the employee performed the work is also not relevant. '[I]f the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted.'"

    Id. (internal citation omitted). Accordingly, to prevail on a claim for unpaid overtime under the FLSA, a "plaintiff must demonstrate that (1) he or she worked overtime without compensation and (2) the [employer] knew or should have known of the overtime work." Id. at 1314-15.

2.  Section 207 (*o*)(1) of the FLSA permits states and their political subdivisions, under certain circumstances, to compensate their employees for time worked in excess of forty hours in a given week by paying them compensatory time at a rate of one and one half hours for

every hour worked. <u>Christenson v. Harris Cty.</u>, 529 U.S. 576, 578-79 (2000) (citing 29 U.S.C. § 207(a)(1)). By contrast, courts have generally concluded that the substitution of comp time for cash wages by private-sector employers is not expressly authorized and, therefore, not permitted under the FLSA. <u>See</u> <u>Ramirez v. Riverbay Corp.</u>, 35 F. Supp. 3d 513, 526 (S.D.N.Y. 2014) (collecting cases). Defendants do not dispute that MLB failed to comply with the FLSA when it gave employees compensatory time in lieu of overtime for hours worked over fifty in a workweek.

3.  In a case where the employer has failed to keep accurate records of the number of hours the plaintiff has worked, the employee merely has the burden to show that he "in fact performed the work for which he was improperly compensated" and then produce "sufficient evidence to show the amount and extent of that [uncompensated] work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687-88 (1946), *superseded by statute as*

*recognized in* <u>Integrity Staffing Solutions, Inc. v. Busk</u>, 135 S.Ct. 513, 517 (2014).

4. ***Inaccurate Records***

   i.  Plaintiffs have demonstrated that Defendants' time records are inaccurate. Multiple witnesses testified to Defendants' practice of altering daily log sheets to add break times. Mr. Hall credibly testified that when he reviewed his daily log sheets, he identified several instances where there was handwriting that was not his on his daily log sheets because someone else had filled in time for breaks that he did not recall taking. Mr. Davis also testified that he noticed discrepancies between his own records and his paycheck and/or the amount MLB stated was in his comp time bank on several occasions.

   ii.  With respect to comp time, MLB initially did not have a practice of adding 1.5 hours into the comp time bank for each one hour worked. At an unspecified time, MLB changed this practice but the deficit for which Plaintiffs were paid for hours incorrectly recorded is not accounted for by the evidence. Mrs. Baker provided conflicting and unconvincing testimony with respect to how MLB maintained comp bank balances. Moreover, Defendants failed to make the comp time bank that they allegedly relied upon available to employees for review. Both Mr. Hall and

17

Mr. Davis testified that they did not know what their comp time
balance upon receiving their final paychecks from MLB.

iii.   As such, Defendants' time records cannot serve as the basis for
deciding Plaintiffs' compensable time. Defendants acknowledge
that contemporaneous records for the compensatory time bank
were not available at trial but urge the Court to rely on
Defendants' Exhibits 38 and 39. However, since Defendants
utilized the unreliable time records to calculate the compensable
time reflected in Exhibits 38 and 39, the Court does not find that
these exhibits can serve as a basis for determining Plaintiffs'
damages.

5.  *Convincing Substitutes*

i.   Plaintiffs argue that the Court should use Plaintiffs' Exhibits 27
and 29 as a basis for awarding back pay damages. But Plaintiffs
did not elicit any testimony explaining how these calculations
were performed or where Plaintiffs obtained the underlying data.
Thus, these exhibits are not a convincing substitute for accurate
records of Plaintiffs' compensable time.

ii.   Plaintiffs also offered Mr. Hall's personal notes as evidence of the
hours he worked. Although Mr. Hall credibly testified that
someone had altered times on his daily log sheets, the Court does
not find that his handwritten notes—which were not based on a

review of *all* of his daily log sheets—provide a sound basis for calculating his compensable time.

   iii.   Accordingly, Plaintiffs failed to establish a convincing substitute for records showing the actual hours they worked.

## 6. *Just and Reasonable Inference of Additional Compensation*

   i.   Although Plaintiffs' Exhibits 27 and 29 lack appropriate foundation, Plaintiffs' testimony provides evidence to support a just and reasonable inference of their right to some additional compensable time. See Anderson, 328 U.S. at 688 ("The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11(c) of the Act.").

   ii.   Mr. Davis:

      1.   Mr. Davis is entitled to an additional two (2) hours of compensable overtime per week for time that he worked between the week ending in April 18, 2010 and February 17, 2013. Mr. Davis credibly testified that he regularly worked between 52-57 hours a week. Indeed, Mr. Davis testified that he had accrued so much time in his comp bank that he was forced to take several weeks off so that MLB could reduce the amount of comp time that he was

owed. Additionally, for a portion of Mr. Davis'
employment, MLB only entered one hour of comp time into
the comp time bank for every hour of overtime that Mr.
Davis worked. While the exact amount of overtime that Mr.
Davis was shorted through MLB's flawed comp time system
is impossible to precisely measure, it was through no fault
of Mr. Davis. Accordingly, Mr. Davis' testimony provides a
basis for the reasonable inference that he merits an extra
two (2) hours of compensable overtime for each of the 149
weeks that he worked for MLB.

2. 2 hours of overtime a week for 149 weeks amounts to 298
hours of overtime. Mr. Davis is therefore entitled to
overtime damages in the amount of $4,782.90 ($16.05 x
298).

iii.  Mr. Hall:

1. Mr. Hall is entitled to an additional thirty (30) minutes of
compensable overtime per week that he worked between
the week ending April 18, 2010 and December 30, 2012. As
set forth above, multiple witnesses testified to MLB's
practice of altering employees' daily log sheets to add break
times. Defendants argue that Mr. Hall challenged breaks
written in when there were long hours between the time he

dropped off one patient and picked up the next patient. However, Mr. Hall testified that he was required to sit and wait either at the VA or at a gas station down the street from the VA between assignments; that he could not leave his waiting spot; and that he was expected to be available for a call while waiting on an assignment. An employee "is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived." 29 C.F.R. § 785.16(a). Accordingly, many of the breaks that MLB's dispatchers recorded were likely fully compensable. Thus, Mr. Davis' testimony provides a basis for the reasonable inference that he merits an extra thirty (30) minutes of compensable overtime for each of the 142 weeks that he worked for MLB.

2. 0.5 hours of overtime a week for 142 hours per week amounts to 71 hours of compensable overtime. Mr. Hall is therefore entitled to overtime damages in the amount of $1,139.55 ($16.05 x 71).

7. **Accrued Compensatory Time and Offsets**

    i.  In their proposed conclusions of law, Defendants proffer that, pursuant to <u>Christensen v. Harris County</u>, MLB did not violate the FLSA by compelling its employees to use their accrued compensatory time. 529 U.S. at 585. According to Defendants, Plaintiffs are therefore not entitled to reimbursement for the hours that they were required to take off using their accrued comp time. But as Defendants acknowledge, as a private employer, MLB was not permitted to rely on 29 U.S.C. § 207(*o*)(1). Given that Defendants violated the FLSA by utilizing a compensation provision reserved for public employers, the Court does not find that Defendants are entitled to rely on the terms of said provision. Indeed, the purpose of 29 U.S.C. § 207(*o*) is to ease the financial burden on public-sector employers who, unlike private employers, cannot pass the costs associated with overtime pay to consumers. <u>See</u> <u>Davis v. City of Loganville, Ga.</u>, No. 3:04-cv-68, 2006 WL 1312411, at *3 (M.D. Ga. 2006) (citing <u>Collins v. Lobdell</u>, 188 F.3d 1124, 1129 (9th Cir. 1999)). Accordingly, the Court will not exclude the weeks that Plaintiffs were required to take off from its calculation of back wages owed.

    ii.  Relying namely on <u>Lupien v. City of Marlborough</u>, Defendants next assert that MLB is entitled to apply the amount of comp time

that it has already paid Plaintiffs against any back wages that
MLB might owe Plaintiffs. 387 F.3d 83, 88 (1st Cir. 2004).
However, even if this Court were persuaded to offset damages
based on the non-binding reasoning set forth in <u>Lupien</u>, the Court
has no basis from which to determine how much Plaintiffs'
damages should be offset. Defendants' counsel relied on payroll
records in calculating how much MLB allegedly owes each
Plaintiff. But multiple witnesses testified to MLB's practice of
altering payroll records, which casts serious doubt upon the
accuracy of Defendants' Exhibits 38 and 39. Moreover, there is no
record of the comp time bank from which the Court could
calculate offsets; even if there were an accurate record of the
comp time bank, Defendants readily admitted that, for a time,
MLB improperly put one hour in the comp bank instead of time
and a half. This deficit is unaccounted for in the record. Thus,
while the Court is in no way bound by <u>Lupien</u>, the instant case is
also distinguishable from <u>Lupien</u> because there is no reliable
evidence demonstrating precisely how much Plaintiffs' damages
should be offset. <u>See</u> <u>Lupien</u>, 387 F.3d at 89-90. Accordingly,
damages will be awarded as set forth above.

iii.   As part of their argument for offsetting damages, Defendants
make much of the fact that during Mr. Davis' appeal to the

23

Department of Labor regarding his unemployment benefits, he
wrote that the last check he received from MLB included "the
amount of comp time that [he] had acquired with the company."
Defendants contend that this letter is persuasive evidence that
Mr. Davis is not entitled to recover any unpaid comp time. But
Defendants' witness also testified that Mr. Davis is owed $456.32.
And Mr. Davis testified that he did not know if the final check
from MLB was for comp time or vacation time. In light of
Defendants' contradictory positions and Mr. Davis' credible
testimony, the Court finds that Mr. Davis' letter to the DOL does
not preclude him from recovering unpaid compensatory time.

**B. Liquidated Damages**

1. Employees who prevail under the FLSA are "entitled to recover
liquidated damages unless the employer makes an affirmative showing
that it acted in good faith." Ojeda-Sanchez v. Bland Farms, LLC, 499 F.
App'x 897, 902 (11th Cir. 2012). The employer must prove that it had:
(1) a subjectively honest intention to ascertain what the FLSA requires
and to act in accordance with it; and (2) objectively reasonable grounds
for believing that its conduct comported with the FLSA. See Dybach v.
State of Fla. Dep't of Corrections, 942 F.2d 1562, 1566-67 (11th Cir.
1991) (citations omitted). Defendants bear the burden of proof on the

issue of good faith. See <u>Smith v. Ideal Towing, LLC</u>, No. 1:16-cv-1359-TWT, 2017 WL 5467154, at \*8 (N.D. Ga. Nov. 13, 2017).

2. Defendants failed to meet their burden as to good faith. As evidence of good faith, Defendants contend that Mrs. Baker had experience with compensatory time systems from her time working for the City of Atlanta Police Department and that she sought Mr. Rambeau's advice on setting up a similar system. The Court, however, finds that Mrs. Baker's vague and self-serving testimony does not support this conclusion. Mrs. Baker did not testify as to the nature or substance of her discussions with Mr. Rambeau, which would be important in determining whether reliance on his advice was both honest and reasonable. Mrs. Baker only stated that she asked if Mr. Rambeau could connect with her husband, Mr. Baker, about some employment law questions and that Mr. Rambeau made recommendations about the comp time policy. Mrs. Baker's testimony does not provide a basis for finding that Defendants acted in good faith. See <u>Smith</u>, 2017 WL 5467154, at \*8 (finding a single assertion by defendant that he relied upon advice of counsel who he believed was knowledge about the FLSA was not proof of good faith).

3. Nor did Defendants offer any other evidence of good faith attempts to comply with the FLSA—indeed, Defendants' failure to maintain adequate records or implement safeguards against faulty record keeping

25

further supports a finding that Defendants had neither an honest

intention to abide by the FLSA or objectively reasonable grounds for

believing its conduct complied with the FLSA. Compare Ojeda-Sanchez,

499 F. App'x at 903 (affirming district court's finding of good faith

where the defendant's accounting procedures demonstrated that the

defendants knew their FLSA obligations and "actively sought to ensure

they were met" via their payroll clerk who was a certified accountant

that took great care to record employee hours correctly); see also Powell

v. Carey Int'l, Inc., 483 F. Supp. 2d 1168, 1176 (S.D. Fla. 2007) (finding

the defendants were entitled to a good faith defense because they

offered "*substantial* evidence" that they did not pay overtime based on

both a good faith belief and advice of counsel) (emphasis added).

4.   The Court finds that in light of Defendants' failure to make an

affirmative showing that they acted in good faith, Plaintiffs are entitled

to liquidated damages.

## C. Retaliation

1.   To establish a claim for retaliation under the FLSA, a claimant must

demonstrate that: (1) he or she has engaged in a protected activity

under the FLSA; (2) he or she subsequently suffered an adverse action

by the employer; and (3) a causal connection exists between the

claimant's protected activity and the adverse action. See Wolf v. Coca-

Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000).

2.  Defendants do not contest that Mr. Davis' meeting with an attorney about his rights under the FLSA constitutes a protected activity. Rather Defendants argue that Mr. Davis has failed to show that he was fired because (1) his termination letter was rescinded via another letter dated the same day; (2) a dispatcher (Ms. Bowen) informed him that the first letter was a mistake; (3) he received a COBRA letter from his insurance company because he was receiving workers' compensation; (4) Mr. Burrell testified that he made hiring and firing decisions and was not aware that Mr. Davis had consulted with an attorney; and (5) MLB denied that Mr. Davis had been terminated when he applied for unemployment benefits.

3.  However, the evidence presented at trial demonstrated that Mr. Baker was fully aware that Mr. Davis had met with an attorney several weeks before Mr. Davis received his first termination letter and that four other employees were fired on the same day for meeting with the same attorney. Mr. Baker testified that, upon Mr. Burrell's recommendation, Mr. Davis was terminated in February for not coming to work. But it stretches logic to conclude that Mr. Davis' termination would have been rescinded the same day if he had truly been fired for failing to show up to work. Further, no one in a managerial capacity orally informed Mr. Davis that his termination was a mistake, and no one questioned why he returned his equipment to the office. Finally, Mr. Burrell testified that

he could not recall whether he was even employed by MLB in February 2013. It follows that if Mr. Burrell was not employed by MLB at the time, he would not have been making hiring/firing recommendations to Mr. Baker. In any event, Mr. Burrell was not a credible witness—to illustrate, Mr. Burrell testified that he fired Mr. Davis on May 20, 2013 for not coming to work, but the actual notice of termination is dated July 16, 2013. Mr. Burrell also stated that he was working as a consultant during that time and did not remember firing anyone during the time that he worked as a consultant.

4. Based on the evidence and the testimony at trial, the Court finds that Mr. Davis was fired on February 17, 2013 in retaliation for meeting with an attorney.

5. Pursuant to 29 U.S.C. § 216(b), an employer who violates the FLSA's anti-retaliation provision is liable for "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) . . ." The Eleventh Circuit has held that the purpose of § 216(b) is to compensate the plaintiff or, in other words, "to put the plaintiff in the place she would have been absent the employer's misconduct." Snapp v. Unlimited Concepts, Inc., 208 F.3d 928, 934 (11th Cir. 2000).

6. Mr. Davis requests $4,251.00 in damages plus liquidated damages in the same amount. Mr. Davis arrived at this number by adding up his average weekly hours worked (50), multiplying his regular rate of

$10.70 by all hours up to 40 in workweek, and multiplying his hours over 40 in a workweek by his overtime rate of $16.05 and then subtracting all other earnings he made in each respective workweek for a total of twenty-six (26) weeks. The Court finds this method a reasonable means of effectuating the compensatory purpose of § 216(b). However, because Mr. Davis requests damages for weeks prior to May 20, 2013, during which he was not cleared to work, the Court will subtract these three weeks from his requested damages.

7. Plaintiffs calculated that Mr. Davis was owed $163.5 per week. Accordingly, Mr. Davis is entitled to 3,760.5 (4,251- (163.5 x 3)) in retaliation damages plus an equal amount in liquidated damages.

## CONCLUSION

1. The Court enters judgment in favor of the Plaintiffs in the total amount of $19,365.90.

   a. Defendants are liable to Mr. Davis for $4,782.90 in overtime damages plus an equal amount in liquidated damages, and for $3,760.50 in retaliation damages plus an equal amount in liquidated damages. Defendants are therefore liable to Mr. Davis for a total of $17,086.80.

   b. Defendants are liable to Mr. Hall for $1,139.55 in overtime damages, plus an equal amount in liquidated damages. Defendants are therefore liable to Mr. Hall for $2,279.10.

2. Plaintiffs are **DIRECTED** to submit any requests for costs and attorney's fees within **twenty-one (21)** days of entry of this Order.

3. The Clerk is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case.[1]

**IT IS SO ORDERED** this 28th day of May, 2019.

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE

---

[1] Administrative closure of a case does not prejudice the rights of the parties to litigation in any manner. The parties may move to re-open an administratively closed case at any time.

30